STATE OF CONNECTICUT *v.* PEDRO L. MIRANDA
(AC 35089)

Lavine, Beach and Borden, Js.

Argued April 24—officially released September 10, 2013

*Alice Osedach,* assistant public defender, for the appellant (defendant).

*Melissa L. Streeto,* senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, and *David L. Zagaja,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. On January 3, 1988, while the relatives with whom she lived were away for the weekend, Carmen Lopez was murdered in her Hartford apartment. In June of that year, Lopez' one-time boyfriend, Miguel Roman, was arrested and charged with the murder. He ultimately was convicted of murder in violation of General Statutes § 53a-54a and sentenced to sixty years incarceration. Two decades later, an investigation into Roman's case by the Connecticut Innocence Project led to the reexamination of physical evidence with contemporary DNA testing technologies and the vacating of his conviction. The results of that investigation led to the arrest and conviction of the defendant, Pedro L. Miranda, on charges of capital felony in violation of General Statutes § 53a-54b (5), murder in violation of

General Statutes § 53a-54a, felony murder in violation of General Statutes § 53a-54c, and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A). He now raises four issues on appeal: (1) that his conviction of murder and felony murder must be vacated pursuant to *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), (2) that there was insufficient evidence to sustain his conviction of kidnapping in the first degree, (3) that the court improperly permitted a detective to testify with respect to the ultimate issue in the case, and (4) that the court improperly denied his request for a missing witness instruction. We agree with the defendant's first claim only and, accordingly, affirm in part and reverse in part the judgment of the trial court.

On Sunday evening, January 3, 1988, seventeen year old Carmen Lopez was murdered in the Hartford apartment that she shared with her cousin and her cousin's family. Lopez' body was discovered late in the day on January 5, when Hartford police officers were dispatched to the apartment to check on her, after relatives and the building manager became concerned that they had not seen or heard from her in several days. The officers discovered a grisly scene in the living room. Behind a couch, in the entryway to an adjacent storage room, they found Lopez' body. She was lying face down, clad only in red underwear and socks. Her arms were bound behind her back and her feet were tied together. A rag was stuffed in her mouth. One end of a detached electrical cord was wrapped around Lopez' neck and the other end was attached to the couch's frame; the effect of this contrivance was to suspend the victim's head five to eight inches above the floor.[1] The following day, the Office of the Chief Medical Examiner determined that the cause of death was asphyxia due to strangulation.

---

[1] A clothes iron without an electrical cord was found outside Lopez' apartment building on March 8, 1988, after the snow had melted.

The initial investigation into Lopez' murder focused on Roman, who was ultimately arrested on June 10, 1988. No other suspects were developed during the investigation. Roman's distinctive mustard-colored van had been seen parked in the vicinity of Lopez' apartment at about the time of the murder. Roman also provided misinformation to the police during two prearrest interviews, heightening their suspicion: he provided inconsistent accounts of when he had last seen Lopez and stated falsely that a friend had borrowed his van from the Sunday afternoon of the murder until the following morning. See *State* v. *Roman*, 224 Conn. 63, 66, 616 A.2d 266 (1992), cert. denied, 507 U.S. 1039, 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993).

Prosecutors developed a motive for the murder during Roman's trial. Ioannis Merkouris, who was incarcerated with Roman while Roman's case was pending, told investigators that Roman had confessed to the killing.[2] According to Merkouris, Lopez, who was six months pregnant at the time of her death, had told Roman that she believed that Roman was the father of her unborn child.[3] Lopez had threatened Roman that she would tell his current girlfriend about the pregnancy. Merkouris further told investigators that, in light of these threats, Roman had gone to Lopez' apartment and killed her.[4]

---

[2] The state did not become aware of Merkouris' information until the defendant was about to rest his case. See *State* v. *Roman*, supra, 224 Conn. 70 n.4. The trial court permitted the state to open its case to present Merkouris' testimony. Id., 70.

[3] Later DNA testing proved that Roman was not the father of Lopez' child.

[4] Merkouris testified at Roman's trial, but was deported before the defendant's trial took place in 2011. Accordingly, Merkouris' testimony from the Roman trial was read to the jury at the defendant's trial as part of his defense, which endeavored to show that Roman was in fact Lopez' killer. Although Merkouris was unavailable to testify, he spoke with Detective Eric Kovanda of the division of criminal justice's cold case unit in the course of his investigation. Merkouris told Kovanda that he may have misunderstood Roman's supposed confession to the Lopez murder because Roman's native language was Spanish and Merkouris' was Greek. Kovanda also learned that, pursuant to a deal with prosecutors, Merkouris was released for time served approximately one week after his testimony. After Merkouris' testi-

See id., 70–71. Merkouris testified for the state in Roman's trial. Id. A jury found Roman guilty of murder in violation of § 53a-54a, and the trial court sentenced him to sixty years incarceration. Id., 64.

In 2008, an investigation into Roman's conviction by the Connecticut Innocence Project prompted the reexamination of physical evidence seized from the crime scene, utilizing DNA testing technology that had advanced significantly since the 1988 investigation. In the spring of 2008, Joy Reho of the state forensic science laboratory swabbed evidence collected from the crime scene in an attempt to obtain "touch" DNA profiles.[5] Among the evidence that Reho swabbed for DNA profiles were terry cloth ligatures used to bind Lopez' hands, feet and neck; the cloth that was used to gag her; her underpants; the electrical cord used to strangle Lopez; a pack of cigarettes and several cigarette butts that were found at the crime scene. A vaginal swab taken in 1988, which revealed the presence of sperm, was also sent out for further DNA analysis.[6] By the time of Roman's trial, DNA analysis had ruled him out as its source.

Because of the Innocence Project's work on behalf of Roman, investigators from the criminal justice division's cold case unit, including Detective Eric Kovanda, were assigned to reevaluate the case. Reprocessing of the vaginal swab resulted in a "hit notification," which indicated that the defendant had contributed the semen identified in the swab. In October, 2008, Kovanda and another investigator, Jeff Twohill, went to the defendant's home, where he lived with his wife, Norma

mony was read to the jury at the defendant's trial, Kovanda testified with respect to what his investigation had revealed about Merkouris' credibility.

[5] Reho explained that the term "touch DNA" refers to the trace biological material that is left behind when a person handles an object.

[6] It was estimated that the sperm was deposited within twelve hours of Lopez' death.

Agosto, a cousin of the victim. Kovanda and Twohill spoke with the defendant and Agosto first individually, and then together. They explained that Roman's conviction was being challenged on the ground that his DNA profile was not present on the retested physical evidence. Kovanda and Twohill did not tell Agosto and the defendant that DNA testing had preliminarily identified the defendant as the contributor of the semen present in the vaginal swab. Kovanda did inform them that he believed that the person identified as the contributor of the semen revealed in the vaginal swab was responsible for Lopez' murder because the same DNA profile was found on other "key" pieces of evidence. Upon hearing this, the defendant "grabbed his stomach" and he "started to moan and weep." The defendant denied ever having had sex with Lopez. He did allow Kovanda and Twohill to perform a buccal swab so that they could compare his DNA profile to profiles present on evidence from the crime scene.

John Schienman, a forensic examiner at the state forensic science laboratory, examined the swabs obtained by Reho in the fall of 2008. He extracted DNA where possible and developed DNA profiles for comparisons to known profiles from Lopez, her unborn child, Roman and the defendant. The defendant's DNA profile was consistent with the profiles developed from the vaginal swab and the swabs from the underpants, the neck ligature and a cigarette butt. Roman's DNA profile was consistent with only the profile developed from the genetic material found on the plug end of the electrical cord used to strangle Lopez. Due to the mixture of DNA found on this piece of evidence, however, one in three Hispanic males would register as possible contributors. The conviction of Roman was vacated and he was released from prison after having been incarcerated for nearly twenty years.

In early December, 2008, the defendant was arrested. A jury later found him guilty of capital felony in violation

of § 53a-54b (5), murder in violation of § 53a-54a, felony murder in violation of § 53a-54c, and kidnapping in the first degree in violation of § 53a-92 (a) (2) (A). He was found not guilty of capital felony in violation of General Statutes (Rev. to 1987) § 53a-54b (7).[7] The defendant was sentenced to life imprisonment without the possibility of parole for his capital felony conviction; fifty years incarceration for his murder conviction, to run consecutively to his sentence for capital felony; twenty-five years incarceration for his felony murder conviction, to run consecutively to his sentences for capital felony and murder; and twenty-five years incarceration for his kidnapping conviction, to run consecutively to the other three sentences. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim that his cumulative convictions for capital felony, murder and felony murder, and the consecutive sentences imposed by the court, violate the constitutional prohibitions against double jeopardy.[8] Specifically, the defendant contends

---

[7] Public Acts 2012, No. 12-5, § 1, effective April 25, 2012, substituted "murder with special circumstances" for "capital felony" in § 53a-54b. At the time of the crimes at issue in this appeal, § 53a-54b (6) was designated as subsection (7). General Statutes (Rev. to 1987) § 53a-54b provides in relevant part: "A person is guilty of capital felony who is convicted of any of the following . . . (7) murder committed in the course of the commission of sexual assault in the first degree . . . ."

[8] The fifth amendment to the United States constitution provides in relevant part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a [g]rand [j]ury . . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."

"Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of article first, § 9, include protection against double jeopardy." (Internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 119, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

that pursuant to our Supreme Court's recent decision in *State* v. *Polanco,* supra, 308 Conn. 242, only one of the three murder convictions can stand and the other two must be vacated.[9] The state agrees that, under *Polanco,* the murder conviction must be vacated because it is a lesser included offense of capital felony. It disagrees, however, with respect to the felony murder conviction. The state argues that the *Polanco* decision adopted the vacatur remedy for multiple convictions of greater and lesser included offenses, but not for other scenarios in which cumulative convictions violate the double jeopardy clause. We agree with the defendant.

"Our standard of review for analyzing constitutional claims such as double jeopardy violations . . . presents an issue of constitutional and statutory interpretation over which our review is plenary." *State* v. *Johnson,* 137 Conn. App. 733, 753, 49 A.3d 1046, cert. granted on other grounds, 307 Conn. 927, 55 A.3d 568 (2012), 308 Conn. 938, 66 A.3d 881 (2013). The aspect of the double jeopardy clause relevant to this appeal is its prohibition of "multiple punishments for the same offense [in a single trial]. . . . With respect to cumulative sentences imposed in a single trial, the [d]ouble [j]eopardy [c]lause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended. . . . Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction.[10] Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Citations omitted;

---

[9] The Supreme Court's decision in *State* v. *Polanco,* supra, 308 Conn. 242, was issued after the briefs had been filed in this case, but before oral argument had occurred. We therefore ordered the parties to address *Polanco*'s impact on the resolution of this case at oral argument.

[10] There is no dispute that the three homicide charges of which the defendant was convicted arose out of the same criminal transaction, that is, the death of Lopez.

internal quotation marks omitted.) *State* v. *Chicano*, 216 Conn. 699, 706–707, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 261, 61 A.3d 1084 (2013).[11]

The general analysis for determining whether two offenses constitute the same offense for double jeopardy purposes was formulated by the United States Supreme Court in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). The *Blockburger* test requires a comparison of the two charged offenses, as defined in the criminal statutes, to determine whether each requires proof of a fact that the other does not. Id., 304. If each of the two offenses contains a unique element, then a defendant constitutionally can be convicted and punished for both. Id. Our Supreme Court has recognized that certain homicide offenses, which do not constitute the same offense under a *Blockburger* analysis, nonetheless raise double jeopardy concerns when the charges arise out of the same criminal transaction. See *State* v. *Chicano*, supra, 216 Conn. 705–10. In *Chicano*, our Supreme Court reaffirmed its holding in *State* v. *John*, 210 Conn. 652, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), that "the intentional murder and the felony murder of a particular victim are the same offense for double jeopardy purposes."[12] (Emphasis omitted.) *State* v. *Chicano*, supra, 710. The court reached this conclusion, in part, because its analysis of the legislative history of the felony murder statute "[indicated] that the legislature contemplated that only

[11] Our Supreme Court has held that "if double jeopardy claims arising in the context of a single trial are raised for the first time on appeal, these claims are reviewable . . . ." *State* v. *Chicano*, supra, 216 Conn. 705.

[12] The court in *Chicano* further held that intentional murder, felony murder and manslaughter in the first degree are the same offense for double jeopardy purposes. *State* v. *Chicano*, supra, 216 Conn. 710.

one punishment would be imposed for a single *homicide*, even if that homicide involved the violation of two separate statutory provisions." (Emphasis in original; internal quotation marks omitted.) Id.

Prior to *Polanco*, our courts applied the so-called merger remedy when multiple convictions imposed for the same offense violated the double jeopardy clause. *State* v. *Polanco*, supra, 308 Conn. 249–50. Under this approach, in the case of greater and lesser included offenses, the sentence imposed for the lesser included offense is vacated, but "the convictions on the lesser counts become combined with that on the compound offense and [are] *not* . . . merged out of existence. . . . [T]he part of the conviction on the lesser offense [remains] unaffected should the compound offense be invalidated [later] as a matter of law." (Emphasis in original.) *United States* v. *Osorio Estrada*, 751 F.2d 128, 135 (2d Cir. 1984), modified on other grounds, 757 F.2d 27 (2d Cir.), cert. denied, 474 U.S. 830, 106 S. Ct. 97, 88 L. Ed. 2d 79 (1985).

The rationale for "combining" or "merging," instead of vacating, the convictions was to alleviate the risk of any collateral consequences that may arise as a result of multiple convictions; see id.; but also to prevent a defendant from "[avoiding] all punishment if an appellate court later reversed the single conviction on the compound offense but would have upheld the conviction on the lesser count." Id., 134; see also *State* v. *Chicano*, supra, 216 Conn. 723 ("[t]he argument for vacating only the sentence is that if the conviction on the lesser offense is vacated, the defendant might be able to escape all criminal liability if an appellate court later reversed the conviction on the greater offense").

In *Polanco*, our Supreme Court stated that most courts that have considered this rationale for the merger remedy have concluded that vacating the convictions

for lesser included offenses does not result in a windfall for the defendant if the conviction of the greater offense is later reversed. The court noted that "it is . . . a well established practice in our appellate courts to direct the trial court to render a judgment of conviction on a lesser included offense on which *the jury did not even return a verdict,* when the conviction for the greater offense is reversed for reasons that do not touch the elements of the lesser offense." (Emphasis added.) *State* v. *Polanco,* supra, 308 Conn. 262–63. In *Rutledge* v. *United States,* 517 U.S. 292, 306, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996), the United States Supreme Court similarly observed that "federal appellate courts appear to have uniformly concluded that they may direct the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense." Having concluded that the justification articulated in *Chicano* for adopting the merger approach had "since been repudiated," and that the "[merger] remedy in *Chicano* is now at odds with the remedy utilized almost uniformly within the Circuit Courts of Appeals," the *Polanco* court exercised its supervisory authority to adopt the vacatur approach when a defendant is convicted of greater and lesser included offenses. *State* v. *Polanco,* supra, 249. The court explicitly approved the practice of reinstating the conviction of a lesser included offense in the event that the conviction of the greater offense is subsequently reversed for reasons that do not vitiate the previously vacated conviction. Id., 263.

We agree with the state and the defendant that *Polanco* is clearly controlling with respect to the defendant's conviction of capital felony and murder because murder is a lesser included offense of capital felony.[13]

[13] Compare § 53a-54b (5) ("[a] person is guilty of murder with special circumstances who is convicted of any of the following . . . murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety") with § 53a-

Therefore, the defendant's conviction of murder in violation of § 53a-54a must be vacated. In the event that the conviction of capital felony is reversed in the future on a ground that does not affect the murder conviction, that conviction shall be reinstated. See id.

The question left unresolved by *Polanco* is whether the vacatur approach should apply "with equal force to other scenarios in which cumulative convictions violate the double jeopardy clause . . . ." Id., 249 n.3. Although it declined to decide the issue, the *Polanco* court suggested that the remedy of vacatur should apply to these "other scenarios," stating that it "[was] aware of no reason why our holding, of logical necessity," should be limited to a defendant's overlapping convictions of greater and lesser included offenses arising out of the same act. Id.

The state makes two arguments against extending the vacatur remedy beyond cumulative convictions of greater and lesser included offenses. We address each argument in turn. First, the state contends that in other scenarios where overlapping convictions violate the double jeopardy clause, there is "no authority" for reinstating a vacated conviction. According to our Supreme Court, however, the vacatur remedy is no more final than the merger remedy; a vacated conviction can be reinstated if the reason for later reversing the principal conviction does not undermine the vacated offense. See *State* v. *Polanco*, supra, 308 Conn. 263. Moreover, if substituting a conviction of a lesser included offense is proper "[when] the record establishes that the jury necessarily found, beyond a reasonable doubt, all of the essential elements required to convict the defendant"; (internal quotation marks omitted) id.;[14] then, a fortiori, it is proper to reinstate a

54a (a) ("[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person").

[14] But see *State* v. *Sanseverino*, 291 Conn. 574, 593–96, 969 A.2d 710 (2009).

vacated conviction when the jury explicitly found the defendant guilty of the vacated offense. Cf. *United States* v. *Dhinsa*, 243 F.3d 635, 675 (2d Cir.) ("[i]n cases where we vacated a conviction on the greater offense and instructed the trial court to enter a judgment of conviction on the lesser offense, we noted that the jury was instructed on the lesser offense *and* that there existed sufficient evidence to sustain a conviction on the lesser offense" [emphasis in original]), cert. denied, 534 U.S. 897, 122 S. Ct. 219, 151 L. Ed. 2d 156 (2001).

In this case, there would be no need to speculate whether the jury necessarily found, beyond a reasonable doubt, all of the elements required to find the defendant guilty of any homicide offenses vacated for double jeopardy purposes, just as there is no call for speculation in the context of lesser included offenses. The court instructed the jury on the elements of capital felony, felony murder and murder, and the jury found the defendant guilty on all three counts. In light of these jury determinations, reinstatement of any vacated murder conviction would be authorized.

The state additionally contends that when two offenses do not constitute the same offense under the *Blockburger* analysis, there is simply no double jeopardy issue and neither merger nor vacatur is warranted. As a general matter, there is some merit to this argument. See *State* v. *Chicano*, supra, 216 Conn. 727 ("If each of two offenses requires proof of a fact that the other does not, the *Blockburger* test gives rise to the presumption that the legislature intended multiple punishment for the offenses. . . . That presumption is rebutted only by a clear indication of a contrary legislative intent." [Citation omitted.]); see also *State* v. *Denson*, 67 Conn. App. 803, 810–11, 789 A.2d 1075 (no double jeopardy violation where defendant was convicted of two counts of first degree assault, one under General Statutes § 53a-59 [a] [1] and the other under

§ 53a-59 [a] [2], arising out of same act), cert. denied, 260 Conn. 915, 797 A.2d 514 (2002). Our Supreme Court, however, has specifically concluded that the legislature intended that intentional murder and felony murder are alternative means of committing the same offense and "should be treated as a single crime for double jeopardy purposes." (Internal quotation marks omitted.) *State* v. *Chicano*, supra, 708, citing *State* v. *John*, 210 Conn. 652, 695, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). *Blockburger*, therefore, is not controlling in this context.[16] Because *Chicano* holds that felony murder and intentional murder are the same offense for double jeopardy purposes; *State* v. *Chicano*, supra, 710; the vacatur remedy adopted in *Polanco* must apply.

We finally address which of the homicide convictions must stand. In the case of overlapping convictions of greater and lesser included offenses, the remedy is clear: the conviction of the lesser included offense is vacated. *State* v. *Polanco*, supra, 308 Conn. 255. Deciding which convictions must be vacated when the cumulative convictions reflect alternative means of committing the same crime, however, is generally in the discretion of the sentencing court. See *State* v. *Chicano*, supra, 216 Conn. 714. Nonetheless, as in *Chicano*, a remand to the trial court for resentencing is not necessary here. "[T]he intention of the [sentencing court] is clear." Id. The defendant was sentenced to life without the possibility of parole on the capital felony count; the sentences for murder and felony murder were to run consecutively to the capital felony count. Therefore, "[t]he sentences and the manner in which they were imposed clearly indicate that the [court] intended that

---

[16] We are unaware of any other cases which hold that crimes that do not constitute the same offense under *Blockburger* are nonetheless the same offense as a matter of state law. The impact of extending *Polanco*'s vacatur remedy to these scenarios, therefore, is quite limited.

the [sentence for capital felony] control[s]"; id.; the sentences for murder and felony murder were ancillary. The capital felony conviction stands, but the convictions for murder and felony murder must be vacated.

## II

We next address the defendant's claim that there was insufficient evidence to sustain his conviction of kidnapping. Specifically, the defendant contends that the evidence adduced at trial with respect to the kidnapping of Lopez had no independent criminal significance. We are not persuaded.

The following additional facts, which the jury reasonably could have found, and procedural history are relevant to this claim.[16] Lopez resided in a duplex apartment. Elaine Pagliaro, who investigated the crime scene in 1988 as a criminalist for the state forensic science laboratory, identified several "points of struggle"[17] in the residence, demonstrating a protracted conflict that occurred on both levels. Pagliaro's analysis included a theory as to the sequence of events that culminated in Lopez' death. According to Pagliaro, the incident likely began in an upstairs bedroom. Buttons from Lopez' shirt were found on the landing at the top of the stairs on the second level of the apartment, permitting the inference that they had been torn off as Lopez was forced to the lower level. The altercation continued in the storage area. There was a significant amount of

[16] The state asserts that the jury reasonably could have found that the defendant sexually assaulted Lopez. The jury, however, found the defendant not guilty of capital felony pursuant to General Statutes (Rev. to 1987) § 53a-54b (7), that is, intentional murder committed in the course of a sexual assault. Therefore, in considering what facts the jury could have found to sustain the defendant's conviction of kidnapping in the first degree, we do not assume that a sexual assault occurred.

[17] Pagliaro explained that points of struggle between the victim and the assailant can be identified by evidence of disarray, broken objects, and bloodstains, among other things.

debris found on Lopez' back and in her hair, including particles of paint and soil-like material, suggesting that she had been dragged across the floor. There were also bruises on Lopez' face, left shoulder and upper arm, and a laceration on her ear.

The defendant would have eventually subdued Lopez before removing her clothing, which was deposited in the corner of the storage room. Her hands were tied behind her back, and her feet and neck were bound with terry cloth ligatures. A rag was stuffed into her mouth. Finally, an electrical cord was wrapped around Lopez' neck and fastened to the frame of the couch, which obstructed the doorway into the adjacent living room. Lopez was still alive at the time that she was forced into this makeshift noose, which led to her death from asphyxiation.

The defendant was charged with kidnapping in the first degree in violation of § 53a-92 (a) (2) (A). At the conclusion of the state's case-in-chief, the defendant moved for a judgment of acquittal on the kidnapping count, arguing that there was insufficient evidence to establish that offense under *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008). The court denied the motion.

Consequently, the jury was charged, in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and restrains the person abducted with intent to inflict physical injury upon her or violate or abuse her sexually." The court further instructed the jury that "[i]t is alleged that the restraint used against [Lopez] was to inflict physical injury on her or to violate or abuse her sexually. It is not necessary to restrain a person to inflict physical injury or to violate or sexually abuse that person. Nevertheless, some interference with the person's liberty may be necessary or incidental to physical injury, sexual abuse or violation.

To establish the defendant's intent to prevent the liberation of [Lopez] independent from the intent to inflict physical injury on her or to violate or abuse her sexually, the state must prove that the defendant intended to prevent her liberation for a longer time or to a greater degree than that which would be necessary to inflict physical injury on [Lopez] or to violate or abuse her sexually. In this regard, the defendant's intent to prevent her liberation may be manifested by confinement or movement that is more than merely incidental to the other intended acts. In other words, if the confinement or movement is so much a part of the other conduct that it could not be accomplished without such restraint, then the requisite intent to prevent [Lopez'] liberation has not been established."

The court additionally delineated several factors that the jury should consider in deciding whether the confinement of Lopez was of independent criminal significance, or whether it was merely incidental to concurrent criminal acts. These factors included the nature and duration of the movement or confinement; whether the restraint was inherent in the nature of the concurrent criminal conduct; whether the restraint precluded Lopez from summoning for assistance; and whether the restraint created a significant danger or increased the risk of harm to Lopez independent of the other criminal acts. So charged, the jury found the defendant guilty of kidnapping in the first degree.

"In reviewing a sufficiency of the evidence claim, we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . The trier may draw

whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 620–21, 725 A.2d 306 (1999).

"[A] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime." *State* v. *Salamon*, supra, 287 Conn. 547. "[I]n order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime. [T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts . . . ." (Footnote omitted; internal quotation marks omitted.) Id., 546.

"Whether the movement or confinement of the victim is merely incidental to and necessary for [the commission of] another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was *not* merely incidental to the commission of some other, separate crime, the ultimate factual

determination must be made by the jury." (Emphasis in original.) Id., 547–48.

The defendant's argument is that the restraint and confinement of Lopez was necessary to effectuate the strangulation and, therefore, without independent criminal significance. We disagree. Construing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have concluded that the acts of confinement and restraint that culminated in Lopez' death exceeded that which was necessary to commit the murder. The jury reasonably could have accepted Pagliaro's proffered sequence of events in which Lopez was forcibly moved from the second to the first floor of her apartment, where she was stripped of her clothes and physically assaulted. She was then bound and gagged and essentially hanged from the frame of the couch. The jury could have further inferred from Lopez' bruises and laceration that the defendant, before committing the murder, subjected Lopez to a period of physical abuse, which required additional confinement. The facts adduced "reasonably support[ed] a finding that the restraint was not merely incidental" to the murder. (Emphasis omitted.) Id.

A comparison with the underlying facts in *State* v. *Salamon*, supra, 287 Conn. 515, supports this result. In *Salamon*, the defendant assaulted the victim in a stairwell at a train station. Id. As the victim reached the top of the stairs, the defendant grabbed her on the back of her neck, causing her to fall. When she tried to get up, the defendant held her down. When she tried to scream for help, the defendant punched her in the mouth and attempted to put his fingers down her throat. The victim was eventually able to break free and summon help. The altercation lasted about five minutes. Id. The defendant was convicted of, among other offenses, kidnapping in the second degree. Id., 512. The *Salamon* court revised its construction of this state's kidnapping

statutes, announcing the rule described previously, but denied the defendant's request for a judgment of acquittal on the kidnapping count. Id., 548–49. The court held instead that "[o]n the basis of these facts, a juror reasonably could find that the defendant's restraint of the victim was not merely incidental to his assault of the victim." Id., 549.

Similarly, here, it was the jury's prerogative to decide, based on the circumstances, the factual question of whether the acts leading to Lopez' demise were inherent in the means the defendant enlisted to kill her or whether they supported a separate conviction of kidnapping.

### III

The defendant additionally claims that the court improperly permitted Kovanda to testify to the ultimate issue in this case, namely, that the identity of Lopez' murderer was the defendant. The state counters that this precise claim was not raised at trial and, therefore, is not reviewable. If the claim should be reviewable, the state asserts that the court did not abuse its discretion in allowing Kovanda to testify with respect to a statement that he made to the defendant, which caused the defendant to react in a way that suggested consciousness of guilt.

The following additional facts and procedural history are relevant to this claim. Kovanda testified at trial about a meeting that took place in October, 2008, with the defendant and his wife, Agosto, at their home in New Britain. At this point in the investigation, retesting of the vaginal swab taken from Lopez had resulted in a "hit notification" identifying the defendant as the contributor of sperm captured by the swab. Kovanda testified that the purpose of meeting with the defendant and Agosto was twofold: he needed to obtain a buccal swab from the defendant so that confirmatory DNA

testing could be performed, and he "had questions that [he] wanted to ask [the defendant] without influencing his behavior" by disclosing the preliminary results of the DNA analysis.

Kovanda began to testify that he told the defendant and Agosto that "we believed that . . . what we were going to find through [DNA] analysis was that the person who was responsible for the sex . . . ." At that point, the defendant objected "as to the person who was responsible . . . ." The jury was excused and the court heard argument regarding the defendant's objection.

Kovanda stated to the court that he "had told [the defendant and Agosto] that we believed that the person . . . that was going to be identified in the vaginal swab was going to be the killer because [that person was] also identified in other items of evidence that were key." Kovanda further stated that, upon telling the defendant and Agosto of this theory, "[the defendant] bent over and grabbed his stomach and started moaning and began to weep."

The defendant's attorney then attempted to clarify the nature of his objection. He stated: "[T]he concern I have . . . is the characterization of the killer as opposed to merely that this was evidence . . . [that] they expected . . . was going [to] show that [the defendant] had a positive test. But . . . to describe him to the jury as 'we believed that he is the killer,' just based on a positive vaginal swab or whatever positive test there may come from a DNA analysis, I think that is a characterization that should not be placed before the jury." The state responded that Kovanda's statement to the defendant and Agosto was not significant for its truth, but to elicit the defendant's reaction. The court agreed with the state and instructed the jury as follows: "Detective Kovanda is going to be testifying about what

he said. It's being offered only as his statement, not for the truth of the contents of that statement, but what his statement was and . . . subsequently what the reaction was to that statement." Kovanda then testified with respect to what he told the defendant and Agosto and the defendant's reaction.

We first address the state's argument that the claim on appeal was not raised with sufficient precision at trial. The objection proffered by defense counsel was not entirely clear. He did not explicitly say that he objected to Kovanda's testimony because it went to the ultimate issue in the case, which was within the province of the fact finder. The essence of this claim, however, was apparent in defense counsel's assertion that he was concerned with any testimony that suggested that investigators "believe[d] that [the defendant] is the killer . . . ." (Internal quotation marks omitted.) Put simply, defense counsel objected to the propriety of testimony from Kovanda that he and his colleagues had concluded, based on their analysis of the evidence, that the defendant was Lopez' killer. The court seemingly attempted to address this specific concern by instructing the jury that it should consider Kovanda's statement to the defendant and Agosto not for its truth, but for its effect on the defendant. We will, therefore, address the merits of the claim.

Section 7-3 (a) of the Connecticut Code of Evidence provides in relevant part: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact . . . ." "[T]he phrase ultimate issue is not amenable to easy definition. . . . As a rule, however, [t]estimony is objectionable if it embraces an opinion on the ultimate issue to be decided by the trier of fact." (Citation omitted; internal quotation marks omitted.) *State* v. *Finan*, 275 Conn. 60, 66, 881 A.2d 187 (2005). "Because of the wide range of matters

on which lay witnesses are permitted to give their opinion, the admissibility of such evidence rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused, will not constitute reversible error." (Internal quotation marks omitted.) *State* v. *Spigarolo*, 210 Conn. 359, 371, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989).

It was within the court's discretion to conclude that the testimony with which the defendant takes issue did not constitute Kovanda's opinion as to who killed Lopez, the ultimate issue in this case. Kovanda stated repeatedly in his testimony that he deliberately withheld information from the defendant, such as the results of the vaginal swab analysis. He further testified that during the interview "[t]here was a bit of a ruse at play" and that "there was a little bit of a twist to the way we were delivering this information initially . . . ." One reason for this evasiveness, Kovanda explained, was to secure the defendant's cooperation in submitting to a buccal swab. Another reason Kovanda cited was that he "had questions that [he] wanted to ask [the defendant]" without the incriminating DNA analysis "influencing his behavior." Given the investigative nature of the meeting, what Kovanda told the defendant and Agosto about his "theory" of the case likely would have been understood by the jury as a representation designed to evoke a reaction from the defendant. More to the point, Kovanda was never asked to tell the jury his *actual* view of the evidence; cf. *State* v. *Finan*, supra, 275 Conn. 67–68 (testimony of four police officers that they believed defendant was among perpetrators caught on surveillance video improper, as it went to ultimate issue of identification); rather, he was asked how he portrayed the evidence to the defendant and Agosto.[18]

[18] That Kovanda was essentially engaging in investigatory sleight of hand in his interview with the defendant and Agosto is corroborated by the fact that the state's request for DNA analysis of the evidence collected from the victim's apartment was not submitted until October 28, 2008, one week after the interview. Therefore, Kovanda could not have known for a fact that the

Any risk that the jury interpreted Kovanda's testimony as a comment on the ultimate issue in the case was mitigated by the court's clear instruction to the jury that Kovanda's statement was not relevant in itself, but only for the reaction it evoked from the defendant. We presume that the jury acted in accordance with the court's instructions. *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 335, 838 A.2d 135 (2004). The court, therefore, did not abuse its considerable discretion by allowing Kovanda to testify as to what he told the defendant and Agosto about the evidence for the limited purpose of presenting the defendant's quite visceral reaction.

## IV

We finally address the defendant's claim that the court erred in denying his request for a missing witness charge with respect to the state's decision not to call Roman as a witness.[19] The defendant contends that his "theory of defense [was] that the state had thoroughly investigated this case at the time of the crime and had arrested and convicted the true killer, Miguel Roman." Therefore, the defendant argues, the state should have produced Roman so that he could "deny the killing . . . ." This claim need not long detain us.

Our Supreme Court abandoned the missing witness instruction in criminal cases in *State* v. *Malave*, 250 Conn. 722, 738–39, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d

DNA profile obtained from the semen found in the vaginal swab was consistent with DNA profiles developed from other critical pieces of evidence.

[19] Although the defendant filed a request to charge the jury with a missing witness instruction, he appears not to have made any arguments in support of this request. In denying the request for the charge, the court stated that "both sides, equally, could have called [Roman] . . . and also it's not an appropriate charge, it's been deleted for [a] reason." The court permitted the defendant to reference the state's failure to call Roman in his closing argument, but the defendant did not avail himself of this opportunity.

1099 (2000), abrogating *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). This is reason enough to conclude that the court did not err in declining to so charge the jury. Putting *Malave* aside, the defendant's claim misapprehends the rationale for the missing witness charge. "[T]he two requirements for a *Secondino* adverse inference instruction against a party are that the witness: (1) is available; and (2) could reasonably be expected, by his relationship to the party or the issues, to have peculiar or superior information material to the case that, if favorable, the party would produce." (Internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 814, 717 A.2d 1140 (1998). "Whether a party has established the requirements for a *Secondino* instruction is a factual determination that is committed to the sound discretion of the trial court." Id.

The 2008 investigation into Lopez' killing led to the exoneration of Roman and the arrest of the defendant. Given the fact that Roman was cleared of any involvement in the crime, it seems very unlikely that he possessed, or would testify about "peculiar or superior information material"; (internal quotation marks omitted) id.; to the state's case against the defendant. At most, Roman might have denied that he "confessed" to Merkouris, which confession was presented by the defendant in the form of Merkouris' testimony from Roman's trial. The state instead chose to call Kovanda to demonstrate to the jury that Merkouris' testimony at Roman's trial was not credible. See footnote 3 of this opinion. An adverse inference was not warranted on the ground that the state chose to rebut the Merkouris testimony with that of someone other than Roman. "A possible witness whose testimony is for any reason comparatively unimportant, cumulative or inferior to what has been offered should be dispensed with on the general ground of expense and inconvenience, without

anticipation that an [adverse] inference may be invoked." (Internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 815. The court, then, did not abuse its discretion in denying the defendant's request for a missing witness charge.

The judgment is reversed only as to the conviction of felony murder and murder and the case is remanded with direction to vacate the conviction of those offenses. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.