******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KEVIN M. BENEFIELD
(AC 36438)

Lavine, Mullins, and Borden, Js.

*Argued September 10—officially released November 18, 2014*

(Appeal from Superior Court, judicial district of New Haven, Gold, J.)

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. This case requires us to apply the fourth amendment's prohibition against unreasonable search and seizures in light of steady advances in modern day scientific technology, particularly STR DNA testing.[1] Specifically, we must determine whether the defendant's 1986 unqualified consent to a complete search of his saliva sample permitted DNA testing to be performed in 2009. We conclude that the defendant surrendered any expectation of privacy in the sample in 1986, regardless of how or when the sample was to be tested.

The defendant, Kevin M. Benefield, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a) and felony murder in violation of General Statutes § 53a-54c. On appeal, the defendant claims that the trial court improperly (1) concluded that the scope of the consent he gave the police in 1986 to test a sample of his saliva included a DNA test of that sample conducted in 2009, and (2) merged his convictions for murder and felony murder instead of vacating his conviction for felony murder.[2] We affirm in part and reverse in part the judgment of the trial court.

The following facts, as reasonably found by the jury, are relevant to our resolution of the appeal. At all times relevant, the victim, Barbara Pelkey, was employed as a machine operator at R.S. Moulding & Manufacturing Company (business), where she worked the night shift alone from 10:30 p.m. until 6:30 a.m. The business is located in a Wallingford industrial park that houses a number of businesses, including at the time a catering concern and a "car" boutique. On September 3, 1986, Ernest Hernandez, another machine operator, reported for work at 6:30 a.m. and discovered the victim's naked body lying face down in an office at the rear of the business.[3] Hernandez immediately summoned the Wallingford police.

Jeryll Lee McGrath, a Record Journal reporter, arrived at the scene at approximately 8:45 a.m. and interviewed the employees of nearby businesses who had gathered outside the business, which had been cordoned off by the police. The defendant, who was then employed at the catering concern,[4] was interviewed by McGrath. He told her that he knew the victim well enough to say "hello" to her. At the time McGrath interviewed the defendant, the police had not yet released the victim's identity.

Edward T. McDonough, a forensic pathologist and then the state's deputy chief medical examiner, conducted an autopsy of the victim's corpse and testified at trial. The autopsy revealed that the victim had been bludgeoned about the head and neck, and suffered several skull and facial fractures and hemorrhaging over

the entire surface of her brain. The injuries to the victim's neck were consistent with manual strangulation, and the wounds to her head were consistent with being struck with a mallet found near her body.[5] There were bruises and lacerations to her torso, hands and arms, which were indicative of defensive wounds. The victim also suffered a violent sexual assault, resulting in an anal tear and hemorrhaging in her pelvic area. There was sperm in her vagina and anus. McDonough was unable to determine the exact time of the victim's death, but he estimated that it occurred between 2 and 4 a.m. on September 3, 1986. He opined that the victim was alive when the injuries to her head were inflicted and that she died as a result of blunt force trauma to her head and neck.

During their investigation, the police identified several possible suspects, including the defendant. On September 7, 1986, the defendant consented to be interviewed by the police. During the interview, the defendant discussed the victim by name and told the police that he had met her once and knew that she worked alone at night. In a subsequent interview, the defendant again stated that he had met the victim only once and had never gotten closer to her than four feet. Other witnesses, however, recalled seeing the defendant in the victim's company on at least four occasions.

During the September 7, 1986 interview, the defendant provided police with a detailed alibi of where he claimed to have been on the night of the victim's death. He told the police that on September 2, 1986, he was with his girlfriend, Fradrika Hardy, in New Haven from 4 or 5 in the afternoon until midnight. After he took his girlfriend home, he went to the home of his cousin, Felicia Wells. He and Wells went to a bar until closing time. The two then went to an after-hours club, drank beer, and left after twenty minutes to search for Wells' boyfriend. The defendant stated that, after he left Wells, he went home to bed at 1:45 a.m. The defendant also told the police that he went to work at the catering company at 10 a.m. the next day, September 3, 1986. When questioned by the police, Hardy stated that the defendant was with her until 3 a.m. on September 3, 1986. Although the police recognized discrepancies in the defendant's and Hardy's accounts, he did have an alibi.

On September 12, 1986, the defendant permitted the police to obtain samples of his hair[6] and saliva.[7] Prior to providing the saliva samples, the defendant signed a consent form authorizing the police to "conduct a complete search" of the three saliva samples taken by buccal swab. Soon thereafter, personnel at the state forensic science laboratory (laboratory) conducted an absorption-inhibition test[8] that revealed that the defendant's saliva contained antigenic substance H and amylase. Those test results were of little evidentiary value.

Although the police had identified several suspects, they made no arrests in 1986. In September, 1987, however, John Card and Marilu Flaler provided "statements to the police that included unpublished details of the crime . . . ." *State* v. *Ireland*, 218 Conn. 447, 449, 590 A.2d 106 (1991). They identified several men who had made incriminating remarks indicating their involvement in the victim's death. Id. Kenneth F. Ireland, Jr., subsequently was arrested and convicted of the victim's murder, sexual assault, and burglary. Id., 448. In 2009, however, Ireland was exonerated of those crimes on the basis of DNA evidence. See *Skakel* v. *State*, 295 Conn. 447, 706, 991 A.2d 414 (2010) (*Palmer, J.*, dissenting).

In 2009, the police reopened the investigation into the victim's murder, but found no new witnesses. Instead, the police asked personnel at the laboratory to use DNA testing to reexamine some of the evidence the police had gathered in 1986. The results of the DNA testing demonstrated that the defendant could not be eliminated as a contributor of the sperm found in the victim's vagina.[9] On the basis of the DNA results, Lieutenant Robert Fils of the Wallingford Police Department obtained an arrest warrant for the defendant, who was then living in Bronx, New York.

In December, 2009, Fils and two other officers traveled to the Bronx to interview the defendant. Prior to interviewing the defendant, the police advised him of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The police showed the defendant the arrest warrant, which included a charge of sexual assault. The defendant stated to Fils that "it wasn't sexual assault, that it was consensual," that "she took her own clothes off," and that he and the victim had "regular sex" on the floor of the business. The defendant stated that, as he was departing from the business, he saw the victim get dressed and move toward the bathroom. Fils asked the defendant why he killed the victim if the sexual encounter was consensual. The defendant denied killing the victim, but stated that his memory of what took place that night was a bit blurry because he had smoked phencyclidine, commonly known as PCP, that night. He also stated that "it was something that should not have happened," but he did not explain what *it* meant. The police obtained a search warrant to obtain another buccal swab of the defendant's saliva, which was sent to the laboratory for DNA testing. That testing confirmed that the defendant was the source of sperm in the victim's vagina.

The defendant was arrested, returned to Connecticut, and tried to a jury in 2012. The state placed the results of the 2009 DNA testing into evidence over the defendant's objection. The jury found the defendant guilty of murder and felony murder. The court merged the two convic-

tions and sentenced the defendant to sixty years incarceration. The defendant filed motions for a judgment of acquittal and for a new trial; the court denied both motions, and the defendant appealed.

I

The defendant first claims that the court improperly concluded that the scope of the consent he gave the police in 1986 to obtain and test the saliva samples he provided included the DNA testing conducted in 2009. We disagree.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 278 Conn. 341, 347–48, 898 A.2d 149 (2006). When an appeal raises questions of law, as this case does, our review is plenary. Id., 348.

The following facts underlie the defendant's claim. In September, 1986, the defendant agreed to provide bodily samples for investigative testing. On September 12, 1986, the defendant signed a consent form that stated: "I, Kevin Benefield, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Det. Fairchild, and . . . members of the . . . Police Department, *to conduct a complete search of a saliva sample* 3 samples. KB These officers are authorized by me to take from my person a saliva sample. KB This written permission is being given by me to the above-named officers voluntarily and without threats or promises of any kind. /s/ Kevin Benefield." (Emphasis added.)

Prior to trial, on November 3, 2011, the defendant filed a motion to suppress the results of the 2009 DNA testing performed on the saliva sample he provided in 1986 and all evidence derived therefrom, including his 2009 statements to the police. The defendant claimed that the 2009 DNA testing constituted a warrantless, nonconsensual search in violation of the fourth amendment to the federal constitution and article first, § 7, of the constitution of Connecticut.[10] More specifically, the defendant contended that the 2009 DNA testing "exceeded the scope and duration of the original consent given" in 1986. In other words, the defendant argued that the 2009 DNA testing constituted a second search to which he did not consent, and, therefore, it was an unreasonable search.

The parties stipulated to a number of facts concerning the motion to suppress. They stipulated that the defendant knowingly and voluntarily signed the consent form on September 12, 1986, and that he agreed to provide three saliva samples to the police. Moreover, the consent form does not describe the particular testing to be performed on the defendant's saliva sample and contains no express limitation on the scope of the testing or its duration. They also stipulated that the detective who was present when the defendant signed the consent form did not discuss the details of any testing with the defendant. The laboratory tested the defendant's saliva sample in 1986 or 1987, and issued a report on January 21, 1987. After the laboratory completed its testing, the defendant's saliva sample was returned to the police in Wallingford, where it remained for twenty-two years. The defendant never requested the return of his 1986 salvia sample or revoked his consent for testing given on September 12, 1986.

The parties further stipulated that the subject DNA testing; see footnote 1 of this opinion; did not exist in 1986, and that the laboratory began to perform DNA testing in 1999. In July, 2009, the laboratory identified a male DNA profile from the swab that had been taken from the victim's vagina on September 4, 1986. On September 21, 2009, the police submitted the defendant's saliva sample along with the saliva samples of other suspects for DNA testing. The defendant did not give a second consent, verbally or in writing, to the 2009 DNA testing, and the police did not obtain a search warrant for the DNA testing of the defendant's saliva sample. The parties further stipulated that the defendant's DNA profile discovered in 2009 existed in the saliva at the time it was taken on September 12, 1986.

In support of his motion to suppress, the defendant relied on the case of *Florida* v. *Jimeno*, 500 U.S. 248, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991), and its progeny. The trial court found, however, that the facts and legal issue in the present case were distinguishable from those in *Jimeno*[11] and analyzed the question of what rights the defendant relinquished by his consent and what rights he retained. The court concluded that by consenting to the taking of his saliva sample and to using it for investigative purposes, the defendant relinquished his expectation of privacy in the saliva sample.

The court read the consent form signed by the defendant in 1986, and found that he did not limit his consent in any way. Although the defendant could have limited his consent by the type of testing to be performed; see *State* v. *Binner*, 131 Ore. App. 677, 886 P.2d 1056 (1994) (defendant consented to blood draw but limited testing to blood alcohol content, not drugs), he did not limit the type of testing to be performed on his saliva sample. The defendant also could have limited the number of tests and the period of time after the saliva samples

were taken during which the tests had to be performed. See *State* v. *Reagan*, 209 Conn. 1, 13, 546 A.2d 839 (1988) (party may limit scope of consent). The court found on the basis of the consent given by the defendant in 1986 that it was unreasonable to interpret it to permit only one test. The primary violation of the defendant's rights, to which he consented, was the *taking* of saliva samples. The court denied the defendant's motion to suppress.

On appeal, the defendant claims that the court improperly concluded that the defendant's consent to provide saliva samples in 1986 permitted the state to conduct DNA testing on the samples in 2009. He argues that in 1986 no objectively reasonable person would have anticipated that in 2009 the state would perform sophisticated DNA testing on the saliva samples he provided in 1986. He asserts that one cannot consent to a test that is not yet in existence. He claims that the sole issue is whether the scope of his consent in 1986 included DNA testing of his saliva in 2009. We conclude that the type of testing performed on the defendant's saliva samples at any time is not the determinative issue in this case; rather, the unqualified scope of the defendant's consent is determinative.

"The standard for measuring the scope of a suspect's consent under the [f[ourth [a]mendment is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect? . . . The scope of a search is generally defined by its expressed object. . . . Although objective reasonableness is a question of law [over which our review is plenary], the factual circumstances are highly relevant when determining what a reasonable person would have believed to be the outer bounds of the consent that was given." (Citations omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 255, 3 A.3d 806 (2010).

The defendant's claim that no objectively reasonable person could have anticipated in 1986 that his saliva samples would be subjected to DNA analysis in 2009 misses the point because the unlimited consent he gave authorized any lawful search at any time by any technology. The defendant concedes that a warrantless search may be reasonable if predicated on consent. See *State* v. *Winfrey*, 302 Conn. 195, 201, 24 A.3d 1218 (2011). The defendant does not assert that the police obtained the 1986 saliva samples illegally, and he stipulated that his DNA present in his saliva in 1986 was present in 2009. His contention is that those samples may not be tested legally in 2009.

To support his position that in 1986 no objectively reasonable person could have anticipated that a saliva sample given at that time would be subject to DNA testing in 2009, the defendant relies on *United States* v. *Jones*, U.S. , 132 S. Ct. 945, 181 L. Ed. 2d

911 (2012). In *Jones*, the United States Supreme Court considered how "to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century *surveillance technique* . . . ." (Emphasis added.) Id., 957 (Alito, J., concurring).[12] *Jones* is factually distinguishable as it concerned surveillance technology, more precisely, a global positioning system used to track the movement of a motor vehicle.[13] The present case concerns the ability to analyze DNA in a sample of bodily fluid, namely, saliva that the defendant voluntarily gave to the police for testing. DNA is a "common denominator characteristic, regardless of which . . . sample is used to read the signature." *Wilson* v. *State*, 132 Md. App. 510, 544–45, 752 A.2d 1250 (2000).

The fourth amendment privacy interest extends "to searches involving intrusions beyond the body's surface." *Schmerber* v. *California*, 384 U.S. 757, 769, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). "Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned." Id., 770. "A consensual search may not exceed the scope of the consent given. . . . Because a consensual search falls within an established exception to the warrant requirement of the Fourth Amendment, the government bears the burden of proving that the search was within the scope of the consent." (Citation omitted; internal quotation marks omitted.) *United States* v. *Melendez*, 301 F.3d 27, 32 (1st Cir. 2002). The defendant bears the burden to limit the scope of consent; see *United States* v. *Price*, 54 F.3d 342, 346 (7th Cir. 1995); and the burden to prove the existence of a reasonable expectation of privacy. See *State* v. *Hill*, 237 Conn. 81, 92–93, 675 A.2d 866 (1996). Significantly, the defendant stipulated that he did not restrict the scope of his consent.[14]

In 1986, the defendant consented to permit the police to conduct a *complete search* of three saliva samples. The consent was without limitation or qualification as to the type of searches to be permitted, the time within which such searches must be undertaken, or the methodology to be used. The fourth amendment to the United States constitution provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const., amend. IV. Exceptions to the warrant and probable cause requirements exist, however, and include a search or seizure conducted pursuant to consent. See *State* v. *Nowell*, 262 Conn. 686, 699, 817 A.2d 76 (2003).

Courts have held that the police do not exceed the scope of consent when the suspect has placed no limits on the consent. See *Florida* v. *Jimeno*, supra, 500 U.S.

251 ("reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car"). The Supreme Court in *Jimeno* noted that "the terms of the search's authorization were simple because the defendant had granted the officer permission to search his car, and did not place any explicit limitation on the scope of the search, after the officer had informed [the defendant] that he believed [that the defendant] was carrying narcotics, and that he would be looking for narcotics in the car." (Internal quotation marks omitted.) *State* v. *Jenkins*, supra, 298 Conn. 256.

In *Jenkins*, our Supreme Court considered "the limitations, under the fourth amendment . . . on police questioning and requests for consent to search automobiles conducted during the course of routine traffic stops." (Footnotes omitted.) Id., 212–13. "Post-*Jimeno* case law makes clear that, on the basis of the exchange between the [police officer] and the defendant, [the officer] reasonably could have understood the defendant's invitation to 'check' the Altima as an invitation to search the interior of the car and unlocked compartments therein, including its center console. . . . [The officer's] question about the presence of 'anything illegal' in the car direct[ed] the defendant's attention to contraband such as narcotics or weapons, despite the fact that he did not mention those items specifically." Id., 256; see also id., 256–57 (federal courts considering scope of general consent to search vehicle). In the present case, the defendant knew on September 12, 1986, that the police were searching for the person who was responsible for the victim's murder when he signed the consent form and provided the police with samples of his saliva. Nonetheless, the defendant placed no limits on the consent to search his saliva samples.

The defendant also argues on appeal that he consented to a single search, which was performed in 1986, and that the search in 2009 was a second search for which the police needed new consent. We do not agree. As previously discussed, the defendant consented to a complete search of three saliva samples, which he did not limit or qualify in any way. The state has identified numerous cases from other jurisdictions where DNA testing was conducted on samples obtained years earlier. Each jurisdiction concluded that where the suspect had not limited the scope of the consent to search, the suspect did not have a reasonable expectation of privacy in the sample at the time it was tested, even if the sample was tested in conjunction with an unrelated case, which is not the situation here.[15]

The reasoning of the New York Appellate Division in *People* v. *King*, 232 App. Div. 2d 111, 663 N.Y.S.2d 610, appeal denied, 91 N.Y.2d 875, 691 N.E.2d 646 (1997), is instructive to the question of whether the DNA testing of the defendant's saliva samples in 2009 passes legal

muster. In *King*, a sample of the defendant Jermaine King's blood was obtained by valid warrant in connection with a certain rape investigation. Id., 114. The sample, however, was tested again with respect to the investigation of another crime. Id. The later test revealed that King was the perpetrator of an unrelated rape. Id., 117. At trial, King filed a motion to suppress on numerous grounds; the motion was denied. Id., 114–15. One of King's claims on appeal was whether his blood, obtained for purposes of one investigation, validly could be used during the investigation of another crime. Id., 115. The Appellate Division noted that an individual has a legitimate privacy expectation with respect to bodily fluids and the right to be free from unreasonable search and seizure of such fluids. Id., 117. Samples of bodily fluids may only be obtained by warrant or one of the exceptions thereto. Id. The Appellate Division concluded, however, that once a sample has been obtained lawfully, there is no need to show probable cause anew for each subsequent use to which the sample might be put, and the individual "can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of the sample." Id. Privacy concerns are not relevant once the sample has been removed lawfully from the suspect's person. Id., 117–18. A defendant does not have a reasonable expectation of privacy in lawfully seized "tangible property, such as a gun or a controlled substance. Although human blood, with its unique genetic properties, may initially be qualitatively different from such evidence, once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests." Id., 118. The Appellate Division upheld the ruling of the trial court in *King*. Id.

The defendant counters that, in the cases from other jurisdictions cited by the state, DNA testing was in use at the time the bodily samples were legally obtained. Even if this is true, the shortcoming in this argument is that the defendant here failed to limit his consent in time or to specific testing methods then known or in existence. As *King* and other cases demonstrate, there is no constitutional violation of a defendant's reasonable expectation of privacy in bodily fluids that are legally obtained in one criminal investigation and subsequently used in an unrelated criminal investigation.[16] See footnote 15 of this opinion.

In summary, the determinative fact in this case is that the defendant consented to "a complete search" of his saliva samples without temporal limitation, and without restriction as to the kinds of tests to be performed. Complete in this context means "brought to an end or to a final or intended condition." Webster's Third New International Dictionary (1966). In this case, a reasonably objective person would understand that the police obtained the saliva sample with the intention

of determining who committed the victim's murder and that they would continue their search until they found the person responsible. On the basis of his broad and unrestricted consent, the defendant reasonably may have expected that the police would continue to search the salvia samples until they found information that either eliminated or did not eliminate him as a suspect in the victim's murder. The court, therefore, properly denied the defendant's motion to suppress the results of the DNA testing of the defendant's saliva samples.

## II

The defendant's second claim is that the court improperly merged his conviction for murder and felony murder rather than vacating his conviction for felony murder. We agree.[17]

The following procedural history is relevant to the defendant's claim. As previously stated, the jury found the defendant guilty of both murder and felony murder. At the time of sentencing, the state asked the court to merge the defendant's convictions and to sentence the defendant on the murder conviction only. The defendant agreed with the state's request, as did the court. The court, therefore, merged the defendant's convictions for murder and felony murder, and sentenced the defendant to sixty years in prison. The defendant appealed.

Thereafter, our Supreme Court decided *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), in which it held that "when a defendant has been convicted of greater and lesser included offenses, the trial court must vacate the conviction for the lesser offense rather than merging the convictions . . . ." Id., 245.[18]

The defendant's claim is one of double jeopardy. Claims of double jeopardy are of constitutional magnitude to which the plenary standard of review applies. See *State* v. *Johnson*, 137 Conn. App. 733, 753, 49 A.3d 1046 (2012), cert. granted on other grounds, 307 Conn. 927, 55 A.3d 568 (2012), cert. granted on other grounds, 308 Conn. 938, 66 A.3d 881 (2013).

Double jeopardy prohibits "multiple punishments for the same offense [in a single trial]. . . . With respect to cumulative sentences imposed in a single trial, the [d]ouble [j]eopardy [c]lause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended. (Internal quotation marks omitted.) *State* v. *Miranda*, 145 Conn. App. 494, 502, 75 A.3d 742, cert. granted in part, 310 Conn. 942, 79 A.3d 894 (2013). In the present case, there was one criminal transaction in which one victim was murdered. Our Supreme Court has analyzed the legislative history of the felony murder statute and concluded that the legislature intended that intentional murder and felony murder are alternative means of committing the same offense and should be treated as a single crime for

double jeopardy purposes. See *State* v. *Chicano*, 216 Conn. 699, 708, 725, 584 A.2d 425 (1990) (citing *State* v. *John*, 210 Conn. 652, 695, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 [1989]), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013).

The merger question presented in this case is similar to the one this court addressed in *State* v. *Miranda*, supra, 145 Conn. App. 494. Our Supreme Court granted the petition for certification to appeal filed by that defendant, Pedro L. Miranda; see *State* v. *Miranda*, 310 Conn. 942, 79 A.3d 894 (2013);[19] but has not yet rendered a decision. Nonetheless, we adopt the reasoning and holding of this court in *Miranda*. See *Diaz* v. *Commissioner of Correction*, 125 Conn. App. 57, 68 n.9, 6 A.3d 213 (2010) (court policy dictates that one panel should not overrule prior panel), cert. denied, 299 Conn. 926, 11 A.3d 150 (2011). The defendant was convicted of murder and felony murder, which are a single crime for double jeopardy purposes. For the foregoing reasons, we remand the case to the trial court with direction to vacate the defendant's conviction for felony murder.

The judgment is reversed only as to the conviction of felony murder and the case is remanded with direction to vacate the conviction of that offense. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Nicholas Yang, a forensic science examiner at the Department of Emergency Services and Public Protection, testified that DNA stands for deoxyribonucleic acid and is the material that "makes us who we are." STR DNA testing is the type of testing Yang used in this case. STR is an acronym for short tandem repeats. In this opinion, we refer to the testing simply as DNA testing.

[2] The court merged the defendant's convictions and sentenced him to sixty years in the custody of the Commissioner of Correction.

[3] The victim was wearing sneakers at the time. Her clothing was neatly folded on a nearby chair.

[4] The defendant's last day of employment at the catering concern was September 8, 1986. There was no evidence as to why the defendant's employment came to an end.

[5] DNA testing performed in 2009 confirmed the presence of the victim's DNA on a mallet found at the crime scene.

[6] The defendant's hair did not match the strands of hair found on the victim's corpse.

[7] The police obtained saliva samples from other men who worked in the industrial park or knew the victim.

[8] The absorption-inhibition test is a blood grouping test.

[9] Other suspects were eliminated as possible contributors of the sperm on the basis of DNA testing.

[10] In his brief on appeal, the defendant notes that the motion to suppress relied on both the state and federal constitutions as legal support for his position. He concedes on appeal, however, that there is no distinction between the fourth amendment to the federal constitution and article first, § 7, of the constitution of Connecticut with respect to the scope of consent to search. See *State* v. *Jenkins*, 298 Conn. 209, 261, 3 A.3d 806 (2010).

[11] The issue in *Jimeno* concerned the scope of consent given at the scene of a motor vehicle stop. More specifically, when the motorist gave the police officer permission to search the trunk of his vehicle, did his consent included a search of the containers in the trunk.

[12] The case of *Katz* v. *United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L.

Ed. 2d 576 (1967), Justice Alito wrote, "rests on the assumption that this hypothetical reasonable person has a well-developed and stable set of privacy expectations. But technology can change those expectations. Dramatic technological change may lead to periods in which popular expectations are in flux and may ultimately produce significant changes in popular attitudes." *United States* v. *Jones*, supra, 132 S. Ct. 962, (Alito, J., concurring).

[13] Justice Alito analyzed the question presented in *Jones* under the fourth amendment "by asking whether [Jones'] reasonable expectations of privacy were violated by the long-term monitoring of the *movements* of the vehicle he drove." (Emphasis added.) *United States* v. *Jones*, supra, 132 S. Ct. 958. The majority in *Jones* performed its analysis under the common law of trespass to chattels. Id., 957.

[14] The defendant stipulated that "[t]he consent form does not contain any description of the particular testing that will be performed on the defendant's saliva sample. There is no expressed limitation on the scope of the testing or the duration of the testing in the September 12, 1986 consent form." Moreover, he stipulated that he "himself placed no condition or expressed limitation on his written consent."

[15] See, e.g., *Wilson* v. *State*, supra, 132 Md. App. 510 (police need not obtain warrant to retest blood sample legally seized seven years earlier in unrelated case as defendant had no expectation of privacy in sample); *Bickley* v. *State*, 227 Ga. App. 413, 489 S.E.2d 167 (1997) (blood sample obtained by warrant in one case used in multiple rape investigations); *Washington* v. *State*, 653 So. 2d 362 (Fla. 1994) (once blood samples obtained, police not restrained from using evidence in unrelated case), cert. denied, 516 U.S. 946, 116 S. Ct. 387, 133 L. Ed. 2d 309 (1995); compare *State* v. *Binner*, supra, 131 Ore. App. 677 (defendant limited consent to testing for blood alcohol content, but not drugs).

[16] If there is no violation for the use of bodily fluids to compare DNA between and among criminal investigations, it is difficult to understand why DNA testing in the very case in which the samples were legally obtained by the police would violate the defendant's expectation of privacy. See *State* v. *Foreman*, 288 Conn. 684, 706–709, 954 A.2d 135 (2008) (buccal swab legally obtained in one case used in investigation of second case; consent to search not rendered involuntary because police did not tell defendant purpose of underlying search); *Bickley* v. *State*, 227 Ga. App. 413, 415, 489 S.E.2d 167 (1997) (multiple DNA testing permitted, results are like fingerprints maintained on file by law enforcement authorities for further investigation).

[17] Although we agree with the defendant that the court improperly merged the defendant's convictions rather than vacating the felony murder conviction, we note that the court's ruling was consistent with the law at the time of sentencing. See *State* v. *Chicano*, 216 Conn. 699, 725, 584 A.2d 425 (1990) (combine convictions and vacate sentence on lesser offense), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), overruled in part by *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013). *Polanco* was decided subsequent to the defendant's filing his appeal in this court.

[18] "Prior to *Polanco*, our courts applied the so-called merger remedy when multiple convictions imposed for the same offense violated the double jeopardy clause. . . . Under this approach, in the case of greater and lesser included offenses, the sentence imposed for the lesser included offense is vacated, but the convictions on the lesser counts become combined with that on the compound offense and [are] *not* . . . merged out of existence. . . . [T]he part of the conviction on the lesser offense [remains] unaffected should the compound offense be invalidated [later] as a matter of law." (Citation omitted; internal quotation marks omitted.) *State* v. *Miranda*, 145 Conn. App. 494, 504, 75 A.3d 742, cert. granted in part, 310 Conn. 942, 79 A.3d 894 (2013).

[19] The certified question is "Did the Appellate Court properly apply . . . *Polanco* . . . which held that the appropriate remedy for cumulative convictions of greater and lesser included offenses arising from the same incident is to vacate the conviction for the lesser offense, to cumulative homicide convictions arising from the killing of a single victim?" *State* v. *Miranda*, supra, 310 Conn. 942.